Opinión disidente emitida por la
Jueza Asociada Señora Pabón Charneco,
a la cual se unen los Jueces Asociados Señores Rivera García y Feliberti Cintrón.
Disiento del resultado anunciado en la Opinión Mayori-taria que hoy emite este Tribunal. Respetuosamente, con-sidero que la Opinión Mayoritaria yerra en su aplicación de la Doctrina de la Buena Fe, la cual permea todo nuestro ordenamiento, y con ello avala la conducta antijurídica de una parte en una relación contractual. En el camino se penaliza a la parte débil en un contrato de adhesión y se torna más difícil para nuestro ordenamiento la protección de uno de los objetivos de la Ley de Derecho de Multipro-piedad y Clubes Vacacionales de Puerto Rico, infra (en ade- *556 lante Ley Núm. 252): proteger a los compradores de dere-chos vacacionales en Puerto Rico.(1)
I
Según se discute en la Opinión Mayoritaria, la Ley Núm. 252-1995 (31 L.P.R.A. sec. 1251 et seq.), le reconoce un derecho a los desarrolladores de Complejos de Multipro-piedad a que, una vez revelen la fecha en la cual las insta-laciones de alojamiento de multipropiedad estarán cons-truidas, si por alguna razón no se han culminado, puedan extender el término para finalizarlas hasta dieciocho (18) meses después de la fecha estimada. 31 L.P.R.A. sec. 1254b.
La controversia del caso de autos nos requiere que in-terpretemos si al momento de otorgar un contrato de com-praventa, un desarrollador que no le divulga al comprador la existencia de esa disposición estatutaria viola la Doc-trina de la Buena Fe contractual. Ello, particularmente, cuando en el contrato de compraventa las partes pactan una fecha cierta y exacta en la que el comprador comenzará a disfrutar de su derecho de multipropiedad.
Considero que en el caso de autos se violó la Doctrina de la Buena Fe contractual. Es un principio axiomático de nuestro sistema de derecho la existencia de unas normas vinculantes que van más allá de la letra de los estatutos. Es decir, la norma positiva no solamente se encuentra en el texto de las leyes aprobadas por la Asamblea Legislativa, sino que a base de la interacción de otras normas pueden surgir doctrinas que suplan la totalidad del derecho posi-tivo de nuestro sistema. En varias ocasiones, los legislado-res codifican los contornos de estas doctrinas generales del Derecho, por lo cual su aplicación caso a caso queda en *557 manos de la Rama Judicial. Véase H.L.A. Hart, The Concept of Law, 2da ed., Nueva York, Oxford University Press, 1994, págs. 135-136. Por lo tanto, el que estas doctrinas generales no estén expresamente consideradas en un esta-tuto no implica necesariamente que estas no estén supedi-tadas a principios generales de mayor jerarquía los cuales, de todas formas, son también parte intrínseca del Derecho positivo de una sociedad.
En nuestro ordenamiento, no hay duda que una de estas doctrinas generales es la figura de la Buena Fe. Es princi-pio conocido que esta doctrina permea todo nuestro orde-namiento positivo y abarca toda actividad jurídica. Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 528 (1982); Vetilla v. Pueblo Supermarkets, Inc., 111 D.P.R. 585, 587-588 (1981). En las relaciones contractuales, esta doctrina se encuentra codificada en el Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375.
Así, hemos establecido que en el ámbito del derecho de contratos, la Buena Fe "impone un arquetipo de conducta social que implica la carga de una lealtad recíproca de con-ducta valorable y exigible”. (Enfasis suplido). BPPR v. Sucn. Talavera, 174 D.P.R. 686, 696 (2008). Esta lealtad exigible obliga a las partes a comportarse de manera leal, fiel, honrada y les exige un comportamiento más allá de un mero actuar correctamente. Id. Por ende, la Buena Fe se debe manifestar en todas las etapas de la relación contractual, incluso en la fase de negociación. Id.; Colón v. Glamourous Nails, 167 D.P.R. 33, 44 (2006), citando a L. Diez-Picazo, Fundamentos del Derecho Civil patrimonial, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 191. La ausencia de Buena Fe en estas fases puede tener el efecto de viciar el consentimiento de la parte que reclama la violación, lo cual puede dar paso a la resolución del contrato. Véase J.R. Vélez Torres, Curso de Derecho Civil: derecho de contratos, San Juan, Revista Jurídica de la Universidad Interameri-cana de Puerto Rico, Facultad de Derecho, 1990, T. IV, Vol. *558 II, 1990, pág. 48; Coop. La Sagrada Familia v. Castillo, 107 D.P.R. 405, 414-415 (1978).
La importancia de esta doctrina en la actividad econó-mica contemporánea ha sido reseñada por diversos auto-res, quienes han expresado que
... el derecho moderno ha adelantado mucho en la protección de este principio, y con ello se está significando cómo su obser-vancia es un elemento vital para toda la circulación económica actual, teniendo en cuenta la manera cómo se realizan los cambios y transacciones, lo cual ...no permite a las partes conocer exactamente la situación jurídica: deben confiar en que sea tal como se les presenta. (Énfasis suplido). J.C. Rezzónico, Principios fundamentales de los contratos, Buenos Aires, Ed. Astrea, 1999, págs. 471-472.
El elemento esencial para analizar si ha ocurrido una violación a la Buena Fe en el ámbito contractual es la leal-tad que se deban las partes. Según ha expuesto detallada-mente el profesor Michel J. Godreau Robles en su artículo seminal Lealtad y buena fe contractual, 58 (Núm. 3) Rev. Jur. U.P.R. 367 (1989), esta lealtad adviene a la vida cuando una parte obtiene el conocimiento de las expectati-vas que la otra parte tiene sobre el objeto del contrato. Una vez se conocen estas expectativas, surge el deber de lealtad en la relación, lo cual “puede implicar un comportamiento que vaya mas allá del mero actuar correcta o incluso honestamente”. íd., pág. 380.(2)
Con particular detalle, el profesor Godreau expone que
[e]l vínculo contractual, producto como es de actos voluntarios en virtud de los cuales se persuade a la otra parte a través de promesas que generan en ella expectativas —aún en el caso extremo del contrato de adhesión— presupone un grado de confianza mutua, ausente en otro tipo de relación patrimonial.
El fenómeno contractual es pues uno de los mejores ejem-plos de una relación jurídica que presupone el deber de lealtad. Recalquemos que es el conocimiento de las expectati- *559 vas legítimas que la otra parte puede tener, lo que justificará la imposición de deber de lealtad. (Énfasis suplido y en el original, y escolio omitido). íd., pág. 380.
Obviamente, “cada relación se debe evaluar individual-mente a la luz de las circunstancias particulares de cada caso, como por ejemplo, la naturaleza de la relación y las cualidades de las partes contratantes”. BPPR v. Sucn. Talayera, supra, pág. 698. En un contrato de adhesión como el del caso de epígrafe, la aplicación de la figura de la buena fe contractual es de mayor relevancia dada la natu-raleza de las negociaciones y las relaciones entre las partes. Véase Godreau, op. cit., págs. 417 — 422.
II
Considero que en el caso de autos, Aquarius Vacation Club (en adelante Aquarius) violó la Doctrina de la Buena Fe Contractual. De entrada, es menester enfatizar que, conforme a lo discutido, aunque la Buena Fe permea todo nuestro ordenamiento, la Ley Núm. 252, supra, va más allá y adopta la doctrina de la Buena Fe en su Sección 10-102. En específico, esa disposición estatutaria establece que
[t]do contrato o deber regido por este capítulo impone una obli-gación de buena fe que significará la honestidad de hecho y la observancia de normas razonables de trato justo en su cumpli-miento o aplicación. 31 L.P.R.A. sec. 1260a.
Por otro lado, la sección estatutaria que regula el conte-nido de los documentos de ofrecimiento público de clubes vacacionales establece unos requisitos mínimos,(3) lo cual no se traduce, necesariamente, en que los vendedores de este tipo de propiedad están exentos de cumplir con otros requisitos que nuestro ordenamiento impone. Esto nos obliga a concluir que la Asamblea Legislativa fue cons- *560 cíente de que podrían existir otros requisitos de divulga-ción que los desarrolladores de clubes vacacionales ten-drían que cumplir al otorgar contratos de compraventa, todo ello sujeto a las normas de la Doctrina de la Buena Fe contractual.
Entiendo que en el caso de epígrafe, Aquarius faltó a la Buena Fe por varias razones. Primero, estamos ante un contrato de adhesión en el cual los compradores no tuvie-ron ningún tipo de participación en la redacción de los tér-minos de la relación contractual. Se trata de un convenio en el cual las partes entraron a una relación jurídica por sesenta (60) años, lo cual incluye el pago de cuotas de man-tenimiento a través de la vida de ese término. Incluso, al momento de pactar, los compradores tuvieron que hacer un pago de diez mil doscientos veinticinco dólares ($10,225), lo cual incluía la cuota de mantenimiento del 2006. Todo ello bajo la expectativa de que podrían disfrutar a partir de una fecha cierta —la segunda semana en junio de 2006— del derecho vacacional que estaban comprando. Esa expec-tativa la conocía Aquarius, ya que en el propio contrato se estableció que para la segunda semana de junio de 2006, los compradores podían hacer uso de las instalaciones que fueron objeto del contrato. Lo que es más, esa expectativa la creó el propio Aquarius, quien tuvo la facultad de redactar los términos del contrato de adhesión otorgado y a pesar de que la Ley Núm. 252, supra, no le requería a este estable-cer en el contrato de compraventa una fecha cierta en la cual los compradores podrían comenzar a disfrutar de su derecho propietario.
Al crear motu proprio esa expectativa surgió un deber de lealtad por parte de Aquarius, por lo cual la Doctrina de la Buena Fe contractual que estatutariamente le impuso el ordenamiento a este le exigía que divulgara al matrimonio Silva-Alicea todas las situaciones que pudieran ser esen-ciales para el perfeccionamiento del contrato. Según discu-tido, una vez se genera ese deber de lealtad, las partes *561 están obligadas a actuar de una manera que va más allá del mero actuar correctamente. Por ende, en el caso de autos, Aquarius debía revelar la posibilidad de que el com-plejo vacacional no estaría disponible para la fecha que se pactó en el contrato ya que el desarrollador se podría aco-ger a la prórroga de dieciocho meses que la Ley 252, supra, le provee.
Lo esencial en ese análisis no es determinar si los com-pradores hubieran firmado el contrato de compraventa si hubiesen conocido sobre la existencia de ese término. La clave está en determinar si surgió un deber de lealtad en Aquarius. Para ello, es incuestionable el hecho de que en el contrato otorgado entre las partes se pactó una fecha cierta. Ese hecho es objetivo; no requiere desfile de prueba más allá del contrato entre las partes ni conocer el estado subjetivo de las partes contratantes y los motivos que los llevaron a acordar lo pactado.
En mi opinión, ese detalle era un factor esencial del con-trato, sobretodo ante el hecho de que Aquarius conocía de las expectativas de los compradores de utilizar el complejo vacacional para junio de 2006, lo cual los llevó a obligarse por sesenta (60) años, le pagaron diez mil doscientos vein-ticinco dólares ($10,225) por ese derecho, incluso el mante-nimiento por el primer año y que no pudieron disfrutar para la fecha que se pactó en el contrato. Ante ese cuadro fáctico, Aquarius tenía un deber de lealtad hacia los com-pradores, por lo cual se violó la Buena Fe Contractual al no revelar la posibilidad de que la construcción del complejo vacacional no estaría culminada para la fecha que se pactó. Por ende, el consentimiento de los compradores estuvo viciado.
Ciertamente, la Doctrina de la Buena Fe no se puede convertir en una válvula de escape para anular cualquier relación contractual, lo cual llevaría a socavar los cimien-tos de la doctrina de pacta sunt servanda. No obstante, los hechos particulares de este caso, en el cual estamos ante un *562 contrato de adhesión por un término de sesenta (60) años, ameritan la aplicación de la figura.
I — I I — i
Finalmente, debo referirme al remedio que otorga la Opinión Mayoritaria a los compradores del caso de epígrafe. El Tribunal entiende que toda vez que los com-pradores no pudieron disfrutar de su derecho vacacional durante el 2006, procede que la partida pagada por estos como cuota de mantenimiento se acredite a los años futuros. Opinión del Tribunal, pág. 554. Además, establece que como los compradores no pudieron disfrutar de su de-recho vacacional durante el 2006, el periodo de sesenta (60) años que acordaron las partes “comenzó a transcurrir desde que los esposos Silva-Olivencia pudieron haber dis-frutado de su derecho vacacional, es decir, desde el verano (junio) de 2007 ...”. íd.
De entrada, es sorprendente que luego de un entramado judicial que duró seis (6) años, el matrimonio Silva-Oliven-cia solo recibe como compensación por el incumplimiento contractual del cual fueron víctimas la ínfima cantidad de ciento setenta y siete dólares ($177). Ni siquiera se les re-conoce una partida por daños. Es curioso que ese sea el resultado del “balance de intereses” que realiza la Opinión Mayoritaria: los consumidores que pactaron un contrato de adhesión y que litigaron su caso por seis (6) años reciben ciento setenta y siete dólares ($177), y la parte poderosa de la relación, que incumplió con su obligación en el primer año de la relación contractual a pesar de conocer las expec-tativas de la otra parte, ve inalterada la acreencia a la cual tiene derecho por sesenta (60) años.
Por último, resulta interesante que en la Opinión Ma-yoritaria se concluya que exigir que Aquarius divulgara la existencia de la disposición estatutaria que le permite am-pliar el término de construcción de las instalaciones vaca-
*563 cionales por dieciocho (18) meses sería un ejercicio de le-gislación judicial, ya que “impondría sobre Aquarius un deber no considerado por nuestro legislador, cuyo efecto le impediría el disfrute de un derecho reconocido por la ley especial para culminar las facilidades en el periodo esta-blecido por el estatuto”. íd., pág. 553. No obstante, la Opi-nión no considera como un ejercicio de legislación judicial que en la Sentencia que hoy se emite se modifican abier-tamente los términos del contrato firmado entre Aquarius y la parte peticionaria de epígrafe. Previo a hoy, el contrato entre las partes tendría vida desde el 2006 hasta el 2066. Ahora, el contrato en realidad tendrá una vigencia desde el 2006 hasta el 2067. ¿Cuál es la medida más creativa, apli-car una doctrina general del Derecho para resolver un con-trato o modificar judicialmente los términos de este en una sentencia?
IV
Por todo lo anterior, disiento del resultado que se anuncia. Me preocupa seriamente la posición en que queda la parte peticionaria de epígrafe, víctima de un vicio del consentimiento y que está obligada a continuar en una re-lación contractual que se incumplió desde el primer año de vigencia. Me preocupa, además, lo que pudiera significar la Opinión que se emite para los consumidores puertorrique-ños de este tipo de servicio y por los cuales primordial-mente se aprobó la Ley Núm. 252, supra.
Consecuentemente, revocaría la determinación del Tribunal de Apelaciones y resolvería el contrato otorgado en-tre las partes por vicios del consentimiento según la Doc-trina de la Buena Fe contractual.

 Los hechos del caso de autos están correctamente discutidos en la Opinión del Tribunal, por lo cual no considero necesario repetirlos en esta opinión disidente.

 Citamos con aprobación este análisis en BPPR v. Sucn. Talavera, 174 D.P.R. 686, 698 (2008).

 31 L.P.R.A. sec. 1255a.